[No. 35573.    Department Two.    September 7, 1961.]

*In the Matter of the Estate of* CLARA BODE BAILEY,
*Deceased.**

*Reported in 364 P. (2d) 539.

*Stanley J. Krause*, for appellant.

*MacDonald, Hoague & Bayless*, by *Kenneth A. MacDonald*, for respondents.

DONWORTH, J.—Clara Bode Bailey died intestate on March 21, 1955, leaving as heirs and distributees her sisters, Louisa Bode (who has since died), Lottie Bode (hereinafter called appellant), and three adult children of a deceased brother. These children are Melba Olson, Grace Simonson and Ivan Bode (hereinafter called respondents), each of whom has a one-ninth interest in the estate. Mrs. Bailey's estate was appraised as having a gross value of $242,702.43.

Appellant served as special administratrix of the estate from May 2, 1955, until August 1, 1955, when she was succeeded by Messrs. C. A. Graves and J. R. Schneider, who were then appointed general coadministrators of the estate. They immediately qualified and since then have administered the estate. On May 8, 1959, they filed their petition for final distribution.

Prior to her death, at the age of eighty-seven years, Mrs. Bailey (referred to as the decedent) and her two sisters lived together in Pacific county. During her lifetime, the decedent had acquired hundreds of parcels of real estate, and her principal source of income was in real-estate dealing and money lending. The condition of the decedent's documents and records at the time of her death is described in

finding No. 17 in the court's interim order of January 28, 1958, which approved the administrator's final account. A portion of this finding is quoted in the margin.[1]

[1]". . . That no acceptable income tax returns had ever been filed and no financial records as such were ever found. And those finally located by the administrators consisted of twenty-four large cartons of miscellaneous documents, including financial data on scraps of paper, deeds, mortgages, and contracts, notes, I.O.U.'s and fire insurance policies, all of which had to be examined, compared and investigated for value, both as to estate assets and past due income tax liability. It was necessary to determine the extent of decedent's business activities for a period of over sixty years so as to reconstruct her estimated income for all years in order to obviate income tax penalties for fraud and to show that no taxable income was had by decedent during the years she has filed no returns or paid no tax. It was also necessary to definitely pinpoint her receipts and disbursements for the years 1950-54 inclusive, in order to prepare income tax returns for those years. Decedent's net worth as of March 1, 1913 had to be reconstructed, including the problem of timber valuation for gain or loss on future sales.

"After a preliminary examination of this mass of heterogeneous documents it became apparent that decedent not only failed to follow any recognized system of keeping accounts and records, but conveyed various pieces of her properties to one or other of her two sisters on several occasions because of litigation in which she was involved. The sisters at later periods reconveyed to her and there were various other conveyances and reconveyances between other members of decedent's family, not to mention dozens of unrecorded documents, resulting utter confusion. A complete filing system and a set of books as well as a complete abstract of conveyances to and from decedent was necessarily established, not only to establish ownership but to establish values as of date of acquisition and also sale. After assembling the contracts, mortgages, promissory notes and other financial data requiring over a hundred files, each had to be separately investigated to determine, first the title of decedent, secondly the equity of decedent and the amount due. Substantial discrepancies were found in nearly every transaction which necessitated interviews with each of the third parties concerned. Also interviews with Lottie and Louisa Bode were had during the latter's lifetime, but the information obtained from the sisters was frequently valueless, if not contradictory.

"Computing balances due on these transactions was also difficult since the debtors had paid Lottie Bode both before and after decedent's death, no accounting for which has been obtained from Lottie Bode. All past financial data was finally assembled, prepared and presented to the Internal Revenue Service, including medical testimony as to decedent's incapacity to have an intent to defraud and the penalty for failure to file declaration of estimated income was averted by showing of reasonable cause, and after a volume of correspondence and numer-

There are some other notable events in this rather unique fact pattern. On November 7, 1958, at a public sale of certain assets of this estate, appellant was the successful bidder. For reasons not altogether apparent from the record, appellant refused to pay for these assets and the administrators were compelled to commence an action against appellant, which resulted in a judgment in their favor for $68,112.80, together with costs and interest. Furthermore, appellant has five times during the course of these proceedings been adjudicated in contempt of court for her deliberate failure and refusal to comply with court orders to deliver to the administrators the assets and records of decedent above referred to which she held in her possession. It was necessary for the administrators to have these items in order to perform their official duties. One of the contempt orders provided for appellant's imprisonment in the county jail for sixty days, ending on December 4, 1955.

In a contempt order dated February 10, 1956, the trial court found, in part, as follows:

"1. That Lottie Bode has failed and refused to deliver to the administrators all of the assets of said estate and that prior to November 26, 1955 said Lottie Bode had in her possession hundreds of documents pertaining to the affairs of this estate including bank books, cancelled checks, approximately seventy promissory notes of the face value of approximately $50,000.00, a minimum of seventy-five contracts for the sale of real property and cash which she refused to deliver but which were located by the administrators after a search.

"2. That there are still assets in the hands of said Lottie Bode belonging to said estate and in addition she has failed to render an accounting herein as such special administratrix all without justification and that the said Lottie Bode is in contempt of this court and has been since August 2, 1955, . . ."

On December 16, 1958, respondents filed a petition asking that appellant's share in the estate be charged with a

ous conferences with agents from the Internal Revenue Service a settlement was reached resulting in a net reduction in the governmental assessment in excess of $20,000.00."

sum not in excess of $25,000 as recompense for the additional costs, fees, and expenses incurred in settling the estate, on the theory that such costs, fees, and expenses had allegedly resulted from (1) her refusal to pay to the administrators the amount ($68,112.80) which she had successfully bid for certain assets of the estate at public sale,[2] (2) appellant's failure to co-operate with the administrators by not furnishing information about the business affairs of decedent, and (3) her failure to turn over assets, as well as other acts of harassment and interference with the administrators.

Appellant denied these allegations and affirmatively alleged that respondents had accepted her accounting as special administratrix; that the court had previously made final orders fixing the costs of administration, none of which had been charged to appellant; that the $68,000 judgment and costs recovered by the administrators against appellant was final as to any liability connected with her purchase of certain assets from the estate; and that respondents had participated in, and consented to, the acts which delayed the closing of the estate. These affirmative defenses were denied by respondents.

Upon the trial, the court found in respondents' favor in the amount of $25,000, ordering, on March 10, 1960, that appellant's share in the estate of her sister be charged with that amount.

In order to understand the factual basis for this order, we set forth the following findings of the trial court:

"III. Lottie Bode was appointed as Special Administratrix of the estate of Clara Bode on the second day of May, 1955, and served as such until the appointment of C. A. Graves and J. R. Schneider on August 1, 1955, as administrators c.t.a., d.b.n., and thereafter on September 13, 1955, Lottie Bode, having failed to perform an order of this Court directing her to deliver to C. A. Graves and J. R. Schneider all goods, chattels, monies and effects of Clara Bode Bailey, was adjudged to be in contempt of this Court, and although allowed to purge herself of said contempt by the 21st day

---

[2]See *In re Bailey's Estate,* 56 Wn. (2d) 623, 354 P. (2d) 920 (1960).

of September, 1955, failed to do so, and on the 11th day of October, 1955, was sentenced by this Court to 60 days in jail for her contempt.

"IV. Thereafter, acting under an order of this Court, the administrators searched the home of Lottie Bode and found hundreds of documents pertaining to this estate, including promissory notes with a face value of $50,000.00, 75 real estate contracts, bank books and other documents pertaining to the financial affairs of Clara Bode Bailey, deceased, and thereafter, on the 10th day of February, 1956, Lottie Bode was adjudged to be in continuing contempt of this Court since the second day of August, 1955, because of her failure to account to the administrators and to deliver to them property of the deceased, including bank books, cancelled checks, 75 real estate contracts, cash, and 30 promissory notes with a face value of $50,000.00, and other assets unknown to the Court.

"V. On or about the month of November, 1957, Lottie Bode filed a report as Special Administratrix of this estate, and after considering said report, this Court found it to be erroneous, inaccurate and impossible to verify, and adjudged her still to be in contempt of this Court, and Lottie Bode has never purged herself of this continuing contempt of this Court.

"VI. On the 7th day of November, 1958, at a public sale of the assets of this estate, duly and regularly ordered by this court, Lottie Bode bid in all of the assets of the estate, and in a letter of November 21, 1958 filed in this cause, she objected to some matters connected with the said public sale, and pursuant to an Order of this Court of December 1, 1958, the Administrators commenced an action against Lottie Bode in Pacific County, being Cause No. 13740, and did therein obtain a judgment against her in an amount of $68,112.80, together with interest thereon at six per cent per annum and costs.

"VII. In seeking assets to apply upon said judgment, Charles Welsh, attorney for the administrators since December 1, 1958, prepared and served Writs of Garnishment upon the Raymond Federal Savings and Loan Association and to Irene F. Kellner, Clerk of the above-named Court, and filed a complaint in this Court in intervention in an action entitled David B. Hallin, Trustee in Bankruptcy of Tony Fernandez, et al, vs. Lottie Bode, No. 13,758 [*Hallin v. Bode, ante* p. 280, 362 P. (2d) 242 (1961)], seeking to levy upon the interest, if any, of Lottie Bode in that action.

"VIII. Since December 1, 1958, the administrators and their attorney have acted as agent for Lottie Bode in the collection, disbursement and many business details that affect the real property and assets purchased from this estate by Lottie Bode but which had not been delivered to her because of her refusal to go through with her bid on said property on November 7, 1958.

"IX. Lottie Bode, by her actions disclosed by the entire record of this proceeding, and by her continued and present contempt of this Court, has greatly burdened the estate with legal fees, administrators' fees and costs which would not have been necessary but for her conduct and continued contempt of the orders of this Court.

"X. From the inception of this probate and from the time of the removal of Lottie Bode as special administratrix of this estate, she has remained in contempt of this Court, has withheld assets and information from the administrators, and has obstructed them, their attorney, the Court, and attorneys representing her from time to time during the course of this probate in their continuing effort to assemble the assets and accomplish a distribution to those entitled to the assets of the estate.

"XI. Expenditures so attributable to Lottie Bode, based upon the entire record of this probate and over and above the normal and necessary costs of administration of the estate, follow:

"Prior to December 1, 1958:

| | |
|---|---:|
| "½ of the fees allowed to the joint administrators and their attorney in a total amount of $40,000.00 | $20,000.00 |
| "½ of the clerical charges paid to James Watts in a total amount of $2,042.00 | 1,021.00 |
| "½ of the fees allowed the joint administrators in a total amount of $1,200.00 | 600.00 |
| "90% of the fees allowed the attorney for the joint administrators | 6,948.00 |
| | $28,569.00" |

In her assignments of error, appellant challenges findings Nos. 8, 9, 10, 11, and 12, as not based upon competent and substantial evidence. She further contends that the trial court was in error in its conclusion of law that under the applicable statutes it has power and authority to entertain

respondents' petition, and in holding that appellant's distributive share in the estate should be charged in the amount of $25,000, as prayed for therein.

## I.

The only official capacity in which appellant served in the settlement of the estate of her sister was as special administratrix from May 2, 1955, to August 1, 1955, when the general administrators were appointed.

The duties of a special administratrix are prescribed by RCW 11.32.030 and RCW 11.32.060, which provide that:

"Such special administrator shall collect all the goods, chattels, and debts of the deceased, and preserve the same for the executor or administrator who shall thereafter be appointed; and for that purpose may commence and maintain suits as an administrator, and may also sell such perishable and other goods as the court shall order sold, and make family allowances under the order of the court, and he shall be allowed such compensation for his services as the said court shall deem reasonable." RCW 11.32.030.

"The special administrator shall also render an account, under oath, of his proceedings, in like manner as other administrators are required to do." RCW 11.32.060.

With respect to the powers and duties of general administrators, RCW 11.48.070 is pertinent, and provides as follows:

"The court shall have authority to bring before it any person or persons suspected of having in his possession or having concealed, embezzled, conveyed or disposed of any of the property of the estate, or who has in his possession or within his knowledge any conveyances, bonds, contracts, or other writings which contain evidence of or may tend to establish the right, title, interest or claim of the deceased in and to any property. If such person be not in the county in which the letters were granted, he may be cited and examined either before the court of the county where found or before the court issuing the order of citation, and if he be found innocent of the charges he shall be entitled to recover costs of the estate, which costs shall be fees and mileage of witnesses, statutory attorney's fees, and such per diem and mileage for the person so charged as allowed

to witnesses in civil proceedings. Such party may be brought before the court by means of citation such as the court may choose to issue, and if he refuse to answer such interrogatories as may be put to him touching such matters, the court may commit him to the county jail, there to remain until he shall be willing to make such answers."

With the exception of three months during 1955, when appellant served as special administratrix, her duties and obligations with respect to her sister's estate were precisely the same as those of any other heir. Regardless of her particular status as special administratrix, under the provisions of RCW 11.32.040 she was obligated to surrender to the administrators the assets and records belonging to the estate which were in her possession.

As former special administratrix, appellant had two duties to perform: (a) to deliver to the administrators the assets and documents in her possession pertaining to the estate, and (b) to account to the court for her acts performed in her official capacity.

As to (a), the court found in finding No. 4 that the administrators, acting under court order (while appellant was confined in the county jail), searched appellant's home (which was also the decedent's home), and found hundreds of documents therein described which pertained to the estate. Thereafter, no further demand for property of the estate was made upon appellant.[3]

As to (b), the court found in finding No. 5, that, in November, 1957, appellant filed her report, which was erroneous, inaccurate, and impossible to verify, and that she had never purged herself of her continuing contempt of court. At the hearing on this report, held on December 19, 1957, respondents' counsel (not the same counsel who represented respondents with respect to the petition now before this court), in open court, made the following statement with respect to appellant's failure to render a satisfactory accounting:

" . . . The heirs that I represent, and I represent all of the heirs except Miss Bode are making no objections to

---

[3]See testimony of Mr. Schneider, quoted below.

this accounting as far as we are concerned. We are not entering into any controversy over her accounting as Special Administratrix."

Respondents thereby waived any objections that they may have had to appellant's accounting as special administratrix.

## II.

We now consider appellant's contumacious conduct in failing and refusing to obey the several orders of the court in this proceeding.

■ The record shows that subsequent to August 1, 1955, when appellant was directed to perform certain acts as special administratrix and as the possessor of assets of the estate, the court entered five orders at various times, declaring that appellant was in contempt of court for her willful failure to obey its orders to account and surrender assets. The dates of these orders are stated in the margin.[4]

By the order of October 11, 1955, she was remanded to the custody of the sheriff, who was directed to incarcerate her in the county jail for sixty days (unless she purged herself of contempt by obeying the court order prior to the expiration of that period).

Appellant served her sentence for contempt. Shortly before the expiration thereof, the administrators obtained possession of the remaining assets of the estate. As previously stated, the administrators thereafter did not ask any assistance from appellant. In any event, on February 10, 1956, the court held a further hearing, and, upon the recommendation of the administrators, and in the exercise of its discretion, declined to punish appellant further for her contempt at that time. This terminated any liability based on appellant's contumacious conduct. As stated in

---

[4] Order of September 13, 1955
Order of September 16, 1955
Order of September 29, 1955
Order of October 11, 1955
Order of February 10, 1956

the recent case of *Mitchell v. Watson, ante* p. 206, 361 P. (2d) 744 (1961):

"The contumacy of a party, disobeying an order of a court, may justify his punishment for contempt, but it does not justify the deprivation of his civil rights or the taking of his property and giving it to another."

### III.

In findings Nos. 6, 7, and 8, reference is made to the public sale of certain assets of the estate at which appellant was the successful bidder, and her refusal to consummate the sale. After the administrators obtained the judgment for $68,112.80, they were compelled to resort to garnishment proceedings in order to collect the full amount. A substantial part of the assets purchased by appellant consisted of real-estate contracts on which the vendees had been making, and continued to make, monthly payments. Prior to the sale, these contracts were serviced by the administrators and accounts were kept by them for each contract. After the sale, they continued to do so until the full purchase price of all assets sold to appellant had been collected. During this period, the court found that the administrators and their attorney were acting as agent for appellant in servicing these contracts.

The court, in computing the $25,000 which it charged against appellant's share of the estate, included a portion of their fees and expenses for this work and also for services performed in connection with the garnishment proceedings.

In our opinion, neither of these items could properly be attributed to appellant's delay in satisfying the judgment. Of course, the administrators could not deliver the assets to appellant until they had collected the full purchase price, and meanwhile they had to continue to service the contracts. However, all these matters could have been litigated in the separate action in which the administrators recovered their judgment. Thus, the doctrine of *res judicata* applies. When this judgment was satisfied, they received the amount owing them ($68,000) plus interest thereon at

six per cent per annum from December 1, 1958, to May 1, 1959, plus taxable costs. In such a case, only statutory attorney's fees are allowable. *Percy v. Miller,* 115 Wash. 440, 197 Pac. 638 (1921).

■ A prevailing party cannot maintain a subsequent action to recover expenses or attorney's fees incident to the prior action. *Stone-Easter v. Seattle,* 121 Wash. 520, 209 Pac. 687, 215 Pac. 56 (1922); *Perlus v. Silver,* 71 Wash. 338, 128 Pac. 661 (1912); *Lovell v. House of the Good Shepherd,* 14 Wash. 211, 44 Pac. 253 (1896). Hence, respondents are not entitled to reimbursement of the items referred to above.

We hold that appellant's obligations arising out of her purchase of estate assets were fully discharged when she paid the judgment recovered by the administrators, including interest and costs.

### IV.

The next basis for the trial court's order which is before us on this appeal is the court's finding that appellant had withheld information from the administrators and had obstructed them, their attorney, and the court, from time to time, during the course of this probate in their continuing effort to effect a proper distribution of this estate. See finding No. 10, quoted above.

In considering this facet of the case, there are two questions: (1) specifically, what information did she withhold from these officers of the court, and (2) if the finding is supported by substantial evidence, was appellant under any legal duty to disclose such information?

The testimony of the administrators and their attorney is, in substance, that both before and after she was released from jail appellant refused to answer their questions as to her deceased sister's business affairs.

Mr. Schneider, one of the administrators, testified regarding this issue:

"Q. Did you confer with Miss Bode as to the amounts owing at the time of death and the amounts with which you should charge to hers? A. Yes. I attempted to discuss all the matters contained in the estate with Miss Bode on several occasions. Q. And did you ever receive any in-

formation from her concerning the amounts owing at the time of death or the amounts— A. (Interrupting) No. Miss Bode refused at all times to confer with me. . . . Q. Did you ever ask for information from Miss Bode concerning her knowledge of Mrs. Bailey's transactions from 1913 to the date of your appointment? A. Yes. Q. Did Miss Bode give you that information? A. No. She never gave me any information I requested."

On cross-examination, Mr. Schneider further testified:

"Q. How old is she, do you know? A. She is in her early eighties, I think. Q. What answers — did she tell you she didn't know the answers to your questions? A. Oh, she just didn't answer you and would talk about something else, and tell you to get out of the house maybe. Q. She is a lady that is hard to get along with, isn't she? A. I found her so. Q. And she didn't care to talk to you about the estate, is that it? A. That is right. Q. And so instead of talking to her about it you had to go to other sources? A. Well, after I realized my powers of persuasion were not sufficient, why, I gave up and then, of course, I had to rustle around the best I could. . . . Q. Did you ever ask Miss Bode for any assistance in straightening out that mass of papers? A. Well, probably not, after we got them in our possession. I think by that time we pretty well resigned ourselves to the fact that anything that had to be done we would have to do it ourselves."

Mr. Graves, the other administrator, in his testimony said:

"Q. Now, Mr. Graves, has Miss Bode had occasion to come to your office and talk to you in your capacity as co-administrator? A. She has been in my office a number of times. Q. Have you during those times been able to obtain from her any information concerning Clara Bode Bailey prior to Clara Bode Bailey's death? A. No, not that I recall. Not that I recall. Q. Can you tell us if you have any knowledge of how much of your work in this estate has been caused by your inability to communicate or gain any information from Miss Bode? A. That is very difficult to state. I think you will see for yourself, Mr. Mac-Donald. In other words, reviewing the Court record, if at any particular time according to the Court record Miss Bode would have supplied the information she was ordered to by the Judge it would not have been too difficult to have finished up the estate. Now if someone from the Court rec-

ord could determine, and I certainly cannot, when that could have been done, it would seem to me that all of the work since that particular time would have been largely due from lack of co-operation from Miss Bode."

The following is from the testimony of Mr. Welsh, who was the attorney for the administrators:

"Q. Have you, in the course of this administration, sought to obtain from Lottie Bode information about the transactions of Clara Bode Bailey during her lifetime? A. Yes, particularly because she was the only surviving sister and took care of her, according to her own testimony, her sister's affairs for many years prior to her death. Q. Have you had, on occasion, during administration of this estate, had occasion to confer with the administrators, Mr. Schneider and Mr. Graves, concerning their problems arising from a lack of communication with Lottie Bode? A. For months practically daily. . . . Q. Did you ever seek enlightenment in any of these matters to Lottie Bode? A. Her favorite statement was, it was none of my business. Q. Now, Mr. Welsh, has any of your work in this estate been in any way extended or made more difficult by this attitude you just testified to by Lottie Bode? A. Yes."

He then estimated that the work of the administrators and their fees and expenses, as well as his own, would have been "cut in half" if appellant had communicated with them and had given the requested information.

It appears from the evidence that appellant is being charged $25,000, in part, for refusing to answer questions asked her out of court concerning the affairs of her deceased sister, thus compelling the administrators and their attorney to seek other and more laborious means of ascertaining such information. There is no showing as to what questions were asked appellant by these witnesses, or that appellant had given or could give them the information they were seeking.

Assuming that she could have furnished this information, we have not been cited to any legal authority holding that an heir is under any duty to answer any questions (outside of court) put to him by the representatives of the estate of a decedent concerning the latter's business or personal affairs. Ordinarily, the heir is willing to do

so in order to hasten the day when he will receive his distributive share of the estate, but he cannot be financially penalized for refusing to answer such questions or for declining to furnish such information. Such lack of voluntary co-operation with the administrators cannot, in our opinion, be held to constitute interference with their official functions.

In this state the legislature has provided the means to enable administrators to obtain necessary information from any person. See RCW 11.48.070, *supra.* Indeed, these administrators attempted to pursue this remedy in the present case. By the court's order of December 2, 1955, appellant was cited to appear in court and answer interrogatories relating to the affairs of her sister. Unfortunately, the record does not disclose what took place at this hearing or whether it was ever held.

In their brief respondents argue strenuously that the doctrine of retainer has long been recognized in Washington. Briefly stated, the doctrine of retainer is the right of an executor or administrator to deduct from the distributive interest of an heir an amount of money which the heir owed to the estate. In *Boyer v. Robinson,* 26 Wash. 117, 66 Pac. 119 (1901), this court stated that:

"It seems apparent that before the devisee can have a distributive interest in the estate his debt due the estate must be settled. The interest of the devisees cannot be distributed until the assets of the estate are determined. . . ."

See, also, *Johnson v. Huntley,* 39 Wn. (2d) 499, 236 P. (2d) 776 (1951); *In re Smith's Estate,* 179 Wash. 417, 38 P. (2d) 244 (1934); and *In re Braden's Estate,* 122 Wash. 669, 211 Pac. 743 (1923).

While we quite agree with respondents that the right of retainer (as it is sometimes called) has been adhered to in this state, we find that it has no application to the case before us. The important question here is not how a debt owing from an heir to the estate should be paid, but whether or not the heir was indebted to the estate in the first place. As we find that no debt was proved to exist

between appellant and her sister's estate at the time the order appealed from was entered, the doctrine of retainer becomes irrelevant.

We fully appreciate the trial court's problem in regard to appellant's contumacious conduct, especially during the first year after the administration of this estate began. Her punishment by being confined in jail for sixty days was fully justified by her defiance of the lawful orders of the court. After the term of her incarceration expired, she was found to still be in contempt and could, in the exercise of the court's discretion, have been fined or further incarcerated until she had purged herself of her contempt. However, upon recommendation of the administrators, the court exercised its discretion to stay its hand and imposed no further punishment.

Appellant cannot now be punished by depriving her of a substantial portion of her inheritance ($25,000) and giving half of it to respondents and half to the third sister's estate. *Mitchell v. Watson, supra.*

In our opinion, there is no substantial evidence to support the finding that appellant's conduct in obstructing the administrators by withholding assets and information from them was the cause of additional expenses of administration amounting to $28,569. They obtained possession of the assets while appellant was in jail and, as stated above, she had no legal duty to furnish them any information at their request. Practically all of the expenses referred to were caused by the fact that the decedent had never kept proper accounts of her business transactions and left her affairs in a state of indescribable and well-nigh incomprehensible confusion. She had not filed adequate income-tax returns and it became necessary to ascertain the net value of the decedent's assets as of March 1, 1913. Appellant was not responsible for her sister's deplorable methods of accounting nor for her failure to file proper tax returns during the forty years preceding her death.

But even if there were substantial evidence that appellant's failure to co-operate did cause the administrators

additional expense, appellant's failure to co-operate would not be actionable in any event. The remedies of the administrators are purely statutory and no other remedy lies.

The administrators and their attorney were confronted with a very unusual burden in unraveling this unorganized mass of data (which filled twenty-four cartons). They naturally wanted appellant's assistance in gathering and giving information to them about her sister's business affairs. Appellant declined to discuss these matters with them and they were compelled to pursue more expensive methods of obtaining such information. As above stated, appellant was under no legal obligation to assist the administrators or their counsel in this way.

We have, from our examination of this record, concluded that there is no legal basis for the trial court's order of March 10, 1960, withholding the sum of $25,000 from appellant's share of the decedent's estate and dividing that sum among the other heirs.

The order appealed from is reversed with directions to dismiss respondents' petition.

FINLEY, C. J., HILL, FOSTER, and HUNTER, JJ., concur.